UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT SHIMKUS, JAN MARZEJON,
TIM LYNCH, KATHERINE HEINZMAN,
CONSTANCE JOHNSON, GARY
PELLETIER, MARGARET LEAVITT, GENE
CALLOW, MAUREEN BEECKMAN, BONNIE          Case Number 04-10075-BC
DINAN, MABLE GUOAN, LOLA PELLETIER,       Honorable David M. Lawson
MARION WENK, BILL WENK, ERNIE
STROHMAIER, LOTTIE VERADI, FAY
STILLWELL, PEGGY LASECKI, JOHN MAY,
BARB MAY, and MADELINE SHANN,

                 Plaintiffs,

v.

THOMAS HICKNER, individually and in his
capacity as Bay County Executive, BAY COUNTY,
a Michigan municipal corporation, MICHAEL L.
LUTZ, individually and in his capacity as Bay
County Housing Commissioner, DENNIS R. POIRIER,
individually and in his capacity as a Bay County Housing
Commissioner, RICHARD L. BRYNE, individually and
in his capacity as a Bay County Housing Commissioner,
and EUGENE F. GWIZDALA, individually and in his
capacity as a Bay County Housing Commissioner,

                 Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DISMISSING COUNTS II, III, V, VI AND PART OF COUNT IV OF THE SECOND AMENDED COMPLAINT

Before the Court are six motions for summary judgment by various parties on both sides of

this lawsuit, which was filed in response to defendant Bay County's action to dissolve its

questionably constituted housing commission and terminate its then-director, plaintiff Robert

Shimkus. The plaintiffs believe that Bay County officials were operating the housing commission

contrary to State law because some commission members also held elected positions in county government, and commissioners were paid more than actual expenses for attending meetings. After some of the plaintiffs notified federal government officials of the irregularities, the County dissolved the commission. Shimkus and the other plaintiffs, who are tenants of the County's sole public housing project, claim that Bay County's dissolution of the housing commission violates state and federal law because a local unit of government may operate a public housing project only through such a commission, with membership comprised according to federal regulations to include at least one tenant member. As a consequence, the plaintiffs claim, the County's actions, including the termination of Shimkus, were void.

The plaintiffs have filed a second amended complaint containing six counts. Count I pleads a violation of the Michigan Whistleblower Protection Act and prays for damages to Shimkus; Count II seeks a declaratory judgment that the County must administer its public housing project in accordance with federal law, and the termination of Shimkus is void; Count III requests mandamus to compel the recomposition of a housing commission in a manner prescribed by federal law; Count IV is based on 42 U.S.C. § 1983 and prays for declaratory and injunctive relief and damages for Shimkus for violating his rights created by 42 U.S.C. § 1437, the Fourteenth Amendment, and the First Amendment; Count V requests a mandamus order compelling the Bay County Board of Commissioners to initiate action to recover compensation illegally paid to former housing commission members; and Count VI alleges violations of the standards of public officials and seeks reinstatement and back pay for Shimkus. On September 10, 2004, the plaintiffs filed a motion for summary judgment arguing that they are entitled to the declaratory and mandamus relief requested in Counts II and III of their second amended complaint as a matter of law. Defendants Bay County

and Hinkner (the county executive) responded on October 1, 2004 and moved for summary judgment in their favor on Counts, II, III, IV, and V arguing that the plaintiffs lacked standing to bring those claims and these defendants were entitled to judgment on the merits as a matter of law. These defendants filed a separate motion for partial summary judgment on October 22, 2004 repeating these arguments. Then on January 10, 2005, defendants Bay County and Hinkner filed another motion for summary judgment, this time arguing that Shimkus's whistleblower claim (Count I) should be dismissed because these defendants were not his employer and the plaintiff failed to produce evidence on all the elements of his claim. They also attacked the plaintiffs' section 1983 claim (Count IV). On that same day, plaintiff Shimkus filed another motion for summary judgment arguing that he was entitled to judgment as a matter of law on Counts V and VI of the complaint and asking for an order of mandamus compelling recovery of expenses wrongfully paid to "commission" members, voiding his termination, and awarding him back pay. Finally, on January 10, 2005 defendants Lutz, Poirier, Bryne, and Gwizdala, the members of the county commission who also served on the "housing commission," filed their own motion for summary judgment seeking dismissal of Counts I, IV, and VI, the only counts of the second amended complaint directed at them.

The Court heard oral argument on the motions on April 14, 2005. The Court now finds that there is no legal requirement that the County operate its public housing project through a housing commission, the "housing commission" operating as such between 1998 and 2003 was never legally created and the plaintiff effectively was employed by the County, fact issues preclude dismissal of plaintiff Shimkus's whistleblower and section 1983 claims based on constitutional violations, no personal rights enforceable by the plaintiffs are created by 42 U.S.C. § 1437, the plaintiffs lack

standing to contest the county government's expenditure of funds to reimburse the purported housing commission members, and the defendants' action of "dissolving" the "housing commission," although a nullity because the commission did not exist in 2003 as a legal entity, does not "void" the termination of Shimkus or give rise to mandamus or injunctive relief. Therefore, the Court will deny the plaintiffs' motions for summary judgment, grant in part and deny in part the defendants' motions for summary judgment, and dismiss Counts II, III, V, VI and part of Count IV of the second amended complaint.

## I. Facts and Proceedings

In the United States Housing Act of 1937, Congress established a general program of housing assistance designed "to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and "to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families." 42 U.S.C. § 1437(1)(A) & (B). Under that program, federal funds are made available to provide project-based and individual-based assistance to make affordable housing available to low-income individuals and families. *See* 42 U.S.C. § 1437f. Funds generally are made available through public housing agencies, which operate at the State and local levels. *See* 42 U.S.C. § 1437a(b)(6).

In 1976, Bay County formed an independent housing commission to operate a public housing project known as Center Ridge Arms. Federal funds were provided for the project, subjecting the local government authority to federal statutes and regulations that govern the distribution and use of those funds. The commission later was dissolved, and the county entity that operates that facility underwent several transformations between 1979 and 2003 because of the change in Bay County's

-4-

form of government and the confused responses by the county board of commissioners that followed that change.

The question of how the entity known in 2003 as the Bay County Housing Commission came into existence remains a mystery on this record.  There is no doubt that a housing commission was formed in 1976, but all parties agree that the entity was dissolved when Bay County changed its form of government in 1979, and the duties of the commission were assumed by a newly-created housing department, which itself was later dissolved.  Somehow, although it is not altogether clear how, Bay County began managing its existing public housing through another housing commission between 1998 and 2003, but there is no record of formal action by county government to establish such a public corporation.  Nonetheless, the "housing commission" adopted bylaws on August 26, 1999.  Plaintiff Robert Shimkus was hired as the housing director on September 27, 1997.

The initial resolution establishing a housing commission was adopted by the Bay County Board of Commissioners on October 26, 1976.  However, in November 1978, the Board of Commissioners adopted the Optional Unified Form of County Government (OUFCG) pursuant to Public Act 139 of 1973, Mich. Comp. Laws § 45.551 *et. seq.*  According to Michigan law, when a county opts for the OUFCG, certain boards, commissions, and authorities theretofore in existence, with specifically designated exceptions, are abolished by operation of law.  Mich. Comp. Laws § 45.554.  The specific exceptions are

> the apportionment commission, airport zoning board of appeals, board of county canvassers, board of determination for a drainage district, civil service commission, county drainage board, county department of veterans' affairs administrative committee or soldiers' relief commission, concealed weapons licensing board, election commission, jury commission, library commission, parks and recreation commission, social services board, tax allocation board, a board established to oversee retirement programs, a plat board, a mental health board, a hospital board, an intercounty drainage board, and a building authority established by the county

-5-

> individually or in conjunction with another unit of government and the boards of
> county road commissioners.

Mich. Comp. Laws § 45.554(1). A housing commission is not among those entities that survive the

implementation of a OUFCG. As for those boards, commissions, and departments that are

abolished, their functions "shall be administered by the county executive or county manager in the

manner determined by the county board of commissioners." Mich. Comp. Laws § 45.554(2).

In order to clarify the status of the housing commission in the wake of Bay County's

succession to the OUFCG, county officials requested an opinion from the state attorney general.

The Michigan Attorney General issued an opinion that concurred with the County's interpretation

of the statute. The Attorney General wrote:

> You have, in separate letters, requested my opinion on several questions concerning
> the implementation of the unified form of county government in Bay County . . . .
> You have asked whether . . . the following county agencies survive: . . . 3. Housing
> Commission . . . A familiar principle of statutory construction is that inclusion by
> specific mention excludes what is not mentioned. Van Sweden v. Van Sweden, 250
> Mich. 238; 230 NW 191 (1930). This principle applies to the question of whether
> the Bay County Housing Commission survives upon the implementation of the
> optional unified form of county government in Bay County. The Bay County
> Housing Commission is a commission formed by the county commission to provide
> a governmental service to the citizens of the county. Housing commissions are not
> specifically designated as the type of agency that was intended to survive upon the
> implementation of the optional unified form of county government. If the
> Legislature had intended that housing commissions operating within a single county
> survive, it would have included housing commissions in the list of county agencies
> intended to continue separate existence under the optional unified form of county
> government. It is therefore my opinion that the Bay County Housing Commission
> is abolished on the date the optional unified form of county government becomes
> effective and its powers are to be carried on as provided in 1973 PA 139.

See Defs.' Bay County Resp. [dkt # 45] Ex. 1, Mich. Op. Att'y Gen. 5493 (1979).

Bay County terminated its housing commission, and in 1979 the Board of Commissioners

contacted the area counsel for the Department of Housing and Urban Development (HUD) seeking

a recommendation on how to provide for public housing services and continue to receive federal

funds.  HUD counsel advised that the Housing Commission could not be re-established, but the

Board of Commissioners may have the authority to create a housing department.  Counsel wrote:

> We agree with your opinion that the powers vested in any abolished commission, on the date the OUFCG becomes effective, become general county government powers; however we have difficulty in complying with your request that this Department confirm by letter that Bay County may contract with the Department based on that general transfer of the Housing Commission powers to Bay County.
>
> Public Act 139 of 1973, MSA § 5.302(63) enumerates 11 specific powers an OUFCG has and none of the powers enumerated deal with Low-Rent Public Housing.  And since it seems to be the position of the Court in the Oakland County Case that a commission once abolished and not provided for in the OUFCG Act, cannot be re-created, because to allow re-creation of such a commission would be to circumvent the act, we do not see any method where Bay County is eligible to proceed under the Housing Commission Act.
>
> The Bay County Housing Commission is in a different position than the County Department of Public Works in the Oakland County Case, because the OUFCG Act specifically provides a mechanism for the creation of a Department of Public Works to replace the old Board of Public Works.  We cannot find such a vehicle for the creation of the Bay county Housing Commission pursuant to MSA § 5.302(63).
>
> Although we find nothing in the OUFCG Act or in view of the case law submitted, that would allow Bay county to proceed under the Housing Commission Act. (Public Act 18 of the 1933 extra sessions), we do note that MSA § 5.302(64) provides:
>
> § 5.302(64) Board of county commissioners, consolidation, transfer and creation of departments, exception; director of department.
> Sec 14.  Except to a department headed by elected county officials or the board of county road commissioners, the board of county commissioners may:
> (a) Consolidate departments completely or in part or may transfer a function from 1 department to another upon the affirmative recommendation of the county manager or elected county executive and following a public hearing.
> (b) Create additional departments.
> (c) Require the county manager or elected county executive to serve as director of a department.  (MCL § 45.564.)

It appears that the Bay County Board of Commissioners could, pursuant to MSA §5.302(64)(b)[,] create a department to carry on the functions formerly the responsibility of the Bay County Housing Commission.

Please note that through this letter we are not telling you how Bay County may proceed under the Housing Commission Act.  We are giving you our analysis of the situation and providing a possible method of continuing the functions of the Housing Commission.

Defs.' Bay County Resp. [dkt # 45] Ex. 2, Letter from Saul Green, HUD Area Counsel, to Bay County Corp. Counsel 1-3 (July 19, 1979).

Following that recommendation, on August 28, 1979, the Board of Commissioners passed resolution # 79255 creating a Bay County Department of Housing with "all the powers granted to the abolished Bay County Housing Commission and that said County department is hereby authorized to succeed to all grants, contracts and other legal obligations formerly entered into by the Bay County Housing Commission." *Id*., Bay County Res. # 79255.

The defendants represent that HUD came to view the actions of Bay County as transferring the responsibilities of the defunct housing commission to general county government, rather than a housing department.  HUD's understanding subsequently was conveyed in a memorandum dealing with the general impact of OUFCG adoption:

SUBJECT: Abolition of Housing Commissioners Pursuant to Unified Form of County Government Act, MSA 5.302

When a county adopts the unified form of county government the Board of Commissioners of the particular county assumes all of the powers of the abolished Housing Commission.  Further, the Board of Commissioners assumes and succeeds to all of the obligations, conditions and rights found in grants, contracts and other obligations formerly entered into by the abolished Housing Commission.  To establish itself as the PHA [public housing authority] for the county the Board of Commissioners must submit:

-8-

1. An opinion of counsel that the Housing Commission is abolished, and that the powers and obligations formerly vested in the Housing Commission are now vested in the Board of Commissioners;
2. Rules of Procedure of the Board of Commissioners;
3. A Clerk's Certificate of the rules of Procedure of the Board of Commissioners;
4. Charter of the appropriate county;
5. Clerk's Certificate as to the county charter;
6. Resolution of the Board of Commissioners in which it assumes all powers formerly held by the Housing Commission, and assumes and accedes to all grants, contracts, and other obligations formerly entered into by the Housing Commission; and
7. Clerk's Certificate regarding the Resolution of the Board of Commissioners in assuming the powers formerly held by the Housing Commission and acceding to the grants, contracts and other obligations of the Housing Commission.

*See id.* Ex. 4, Letter from Saul Green, HUD Area Counsel, to Central File (July 10, 1980).

Bay County responded to this advice by rescinding Resolution number 79255 on June 10, 1980, abolishing the housing department, and transferring all power and obligation for public housing to the board of county commissioners.

> WHEREAS, the Bay County Board of Commissioners at the Tuesday, August 28, 1979 meeting past [sic] resolution # 79255 creating the Bay County Housing Department with all powers granted to the abolished Housing Commission and the authorization to succeed to all grants, contracts and other legal obligations formerly entered into by the Bay County Housing Commission, and

> WHEREAS, the Department of Housing and Urban Development has concluded such powers have been assumed by the Bay County Board of Commissioners rather than the Housing Department; so

> THEREFORE BE IT RESOLVED, the Bay County Board of Commissioners rescind resolution #79255 and assume all powers formerly held by the Bay County Housing Commission and subsequently by the Bay County Housing Department.

*Id.*, Ex. 3, Bay County Res. # 80174.

Since 1980, Bay County has operated Center Ridge Arms, a public housing facility. The defendants allege that a public corporate entity separate from the County called a "housing commission" operated Center Ridge Arms from 1998 until 2003, but there is no evidence in the

-9-

record of any government action to create a department, commission, or other public corporation for that purpose. Nonetheless, an entity denominated as the "housing commission" adopted by-laws on August 26, 1999, assembled a group of commissioners, and conducted business as if it were a separate entity. Plaintiff Robert Shimkus avers in an affidavit that a housing commission was established in accordance with state law in 1983, but there is no record evidence to support that claim, and the procedures prescribed by state law for the formation of such a commission are quite elaborate and unlikely to go unnoticed. *See* Mich. Comp. Laws § 125.653.

Defendant Thomas Hickner held the position of Bay County Executive in 2003. The plaintiff, Robert Shimkus, was hired as Bay County's director of public housing on September 27, 1997, and he became the executive director of the "*de facto*" Bay County Housing Commission. He does not reside in Bay County public housing. Plaintiff Jan Marzejon is a resident of Bay County public housing and a former member of the "Bay County Housing Commission." The remaining plaintiffs are tenants of Center Ridge Arms, the County's public housing project.

In the fall of 2003, the Bay County housing commissioners included defendants Lutz, Poirier, Byrne, and Gwizdala, who also were members of the County's Board of Commissioners. Lutz was denominated the chairman of the commission. Plaintiff Jan Marzejon resided in the Charter Ridge Arms development and was the resident member of the housing commission. Robert Shimkus held the title of executive director of the housing commission. He was an at-will employee and managed a staff of two maintenance personnel and one secretary.

In 2002, the local HUD office informed the County of overdue Housing Commission reports concerning a Line of Credit Control System (LOCCS), a Capital Fund Program (CFP), and an Environmental Review for the facility. Apparently, Shimkus was unresponsive to HUD's prior

-10-

phone messages and emails.  Commissioner defendant Gwizdala convened a meeting on October 12, 2002 attended by Shimkus and two county employees where Shimkus agreed to resolve the problem with HUD.  Lutz also explained to him that the deficiencies were serious.  HUD sent another letter dated December 3, 2002 informing the County Board of Commissioners that the Housing Commission had not provided certain reports, namely drug-free work place certification, payments to influence federal transactions certification, and lobbying activities disclosure.  The letter again complained of the commission's unresponsiveness to HUD's communications.  Shimkus denied HUD's representations at meetings on December 18, 2002 and January 13, 2003, but stated that some reports may have been submitted after each of HUD's letters.  He claimed that HUD had no specific deadline for the reports, his secretary had software trouble with the LOCCS system, and the county had not lost any funding money due to the timeliness of his report filing.  The Commission inquired into HUD's accusations by holding a teleconference with HUD representatives.   A HUD staff member provided information following the meeting concerning unreturned phone messages she had left with Shimkus.

Thereafter, the County personnel director, Brian Redmond, prepared a report and recommended several changes in the housing staff's operating practices, including a requirement that Shimkus submit all HUD reports over his signature rather than by support staff personnel, Shimkus must maintain accurate records of all documentation submitted to HUD, and required reports should be submitted well before the deadline.

On March 17, 2003, the Housing Commission received a report from a certified public accountant finding no violations of policies, but it did identify weaknesses in the commission's management, including unreported vacancy information, missing or improperly recorded annual

-11-

inspections of housing units, and excessive maintenance staff for the maintenance hours logged. Around this time, defendants Lutz and Gwizdala instructed the plaintiff to call Lutz before he took any days off, and they asked him to change the hours of his staff.   Shimkus did not object or question the orders.

On June 4, 2003, Jan Marzejon, resident member of the Housing Commission board, started making allegations against other members of the Housing Commission.  For instance, she sent a letter to HUD alleging that the Housing Commission board does not include her in decision making and treated Shimkus unfairly; she commented about these things at a board meeting; she challenged the propriety of the county commissioners holding positions on the Housing Commission; and she objected to the flat fee amount they received for each meeting they attended.

Marzejon wrote another letter to the housing commission dated July 14, 2003 questioning the legality of the county commissioners' role as housing commissioners and their compensation. Shimkus testified that he did not assist in the drafting of the letter.  Marzejon again raised her concerns at a Housing Commission meeting on August 11, 2003.  Shimkus did not speak at the meeting and had not yet begun assisting Marzejon.

Marzejon continued to press her concerns at the September 11, 2003 Housing Commission meeting.  On the day of the meeting, the plaintiff sent a letter to Lutz disavowing any connection with Marzejon's activities.  Marzejon followed up her statements at the meeting by writing the County Executive Hickner on September 15, 2003 concerning the conflict of interest she believed the other housing commissioners had and suggested the addition of another resident member of the Housing Commission.  Hickner responded that the housing commission chairman was making inquiries into the possible conflict of interest.

-12-

Shimkus testified that sometime in October 2003, Lutz threatened Shimkus to keep him from reporting the issues raised by Marzejon:

> Q.  What had they done that made you think they were trying to get rid of you?
> A.  I told Mike Lutz – first of all, Mike Lutz came into the maintenance room one day and he told me that I am not to treat Jan Marzejon as a housing commissioner when she was a resident housing commissioner.  He told me I'm not to treat her, Jan Marzejon as a housing commissioner.  I'm to treat her as a resident, and nothing more, and that – how did he put it – it would be detrimental for me and for my employment, my continued employment with the Housing Commission if I continue my relationship with her or if I ever contact HUD about what's going on with the residents or what was Jan was [sic] talking to HUD about.
> . . .
> Like I said, that I'm not to treat Jan Marzejon as a housing commissioner, but treat her as a resident like any other resident.  And that it would be detrimental for me, my employment, my continued employment if I continued, if I continued to speak with her, hang out with her, however it went, or if I get involved with HUD with her and what's going on with the residents.

Defs.' Bay County and Hickner Second Mot. Summ. J.  [dkt # 50] Ex. 2, Pl.'s Dep. at 57-59.

At the Housing commission meeting on October 9, 2003, Marzejon raised her concerns again.  Shimkus testified that he began researching issues related to Marzejon's allegations at the end of September after learning of a Michigan State Attorney General opinion.  He contacted HUD about these concerns in October and November 2003.  Shimkus said that he did not recall when he began helping Marzejon but testified that he may have provided her with the attorney general opinion before the October meeting. Shimkus explained that he did not complain to any housing commissioner besides Marzejon before contacting HUD because "it wasn't going to do anything good for me to go the commissioners" and she was responsive to the needs of the residents at the housing facility. *Id*. at 89-90.  He further testified that he informed Lutz sometime in October that he had helped Marzejon.  Shimkus may have informed Bobbie Dinan, a resident of the housing facility and former member of the resident council, about his involvement with Marzejon.  Shimkus

-13-

claims the Housing Commission's lack of responsiveness to residents regarding operation of the

facility motivated him to contact HUD.

HUD responded by letter on October 24, 2003:

This office is in receipt of your correspondence concerning several alleged improprieties involving the Bay County Housing Commission (BCHC). The Office of Public Housing has requested HUD's Office of General Counsel to determine whether or not violations exist, as it relates to Public Act 18 and other applicable Michigan laws.

Your correspondence indicates that housing commissioners are being paid $35.00 per meeting; however, Section 4 of Public Act 18 states that commissioners may receive compensation "for actual expenses incurred in serving as a member of the commission in an amount determined by the commission." In other words, commissioners may not receive a blanket amount per meeting; rather any compensation received must be based on the "actual expenses" incurred by each commissioner in attending each meeting. If the housing commissioners are receiving a blanket amount per meeting, this is a violation of Public Act 18.

HUD has learned that currently four (4) members of the Bay County Board of Commissioners also serve as members of the BCHC. This office has determined the Bay County Housing Commission is in Violation of Michigan's Incompatible Public Offices Act, which states that "[a] public officer or public employee shall not hold 2 or more incompatible offices at the same time." The statute defines "incompatible offices" as public offices held by a public official which, when the official is performing the duties of any of the public offices held by the official, results in any of the following with respect to the offices held: (I) The subordination of 1 public office to another, (ii) The supervision of 1 public office by another and (iii) A breach of public office. Note however that the statute was amended in 1992 to provide that any city, village or county having a population of less than 25,000 may "authorize a public officer or public employee to perform, with or without compensation, other additional services for the unit of local government." Because Bay County's population exceeds 25,000, this exemption from the statute **does not apply** to it.

In the instant case, Michigan's Housing Commission Act (i.e. Public Act 18) contains several provisions that make the BCHC subject to the supervision of, and subordinate to, the Bay County Board of Commissioners. For example, upon the recommendation of the appointing authority to the governing body (i.e. county board of commissioners), the governing body may remove a member of the housing commission from office before the expiration of his or her term. In other words, under the current scenario, a member of the Bay County Board of Commissioners who is simultaneously serving as a housing commissioner may vote on the removal

-14-

of a fellow housing commissioner while in his capacity as a member of the county board of commissioners. This is clearly a function where the Bay County Board of Commissioners, through its ability to remove housing commissioners, supervises the housing commission. Another example of the Bay County Board of Commissioners' supervision is found where members of the housing commission receive compensation for expenses incurred while serving as a member of the housing commission. According to Public Act 18, the Board of County Commissioners (i.e. governing body) may adopt a resolution establishing limits on the amount of expenses that may be paid to a housing commissioner. . . . The members of the Bay County Housing Commission Board who are simultaneously serving as members of the Bay County Board of Commissioners, **must** resign from either position. If the Bay County Housing Commission does not take the appropriate action to resolve the issue, the appropriate remedy under law is to refer the matter to the Office of the Prosecuting Attorney for Bay County for disposition in accordance with the statute provided.

Second Am. Compl. Ex. A, Letter from Rita Robinson, Acting Director HUD, to Jan Marzejon dated October 24, 2003. Following receipt of the HUD letter, Shimkus expressed concerns to Lutz about service by county commissioners on the Housing Commission. Shimkus also informed Lutz that certain county commissioners were interfering with his authority to hire a new Housing Commission employee in violation of Housing Commission By-laws Section 9, which states: "Additional Personnel. The Commission may from time to time employ such personnel as it deems necessary to exercise its powers, duties, and functions. Such personnel shall be selected and appointed by the Executive Director at such compensation set by the Commission." *Id*. Ex. B, Housing Commission By-Laws. However, the county commissioners concurrently serving on the Housing Commission remained as members of both assemblies.

Eventually however, on December 9, 2003, the Bay County Board of Commissioners passed resolution 2003-220 by unanimous vote, including all of the defendants, dissolving the Housing Commission and transferring the responsibility for housing services to a housing department, stating as follows:

-15-

> WHEREAS, Bay County implemented the unified form of county government on November 7, 1978 ("Act 139") (P.A. 139 of 1973) and began a period where county functions were realigned to Act 139. Efforts were made to clarify the legal status of the new Housing Commission since Bay County was in the process of creating a housing function to construct and oversee Center Ridge Arms; and
>
> WHEREAS, Based on Attorney General opinions, Michigan Statutes, and a 1979 letter from HUD, Corporation Counsel has given her legal opinion that the Optional Unified Form of County Government Act requires that the Housing Commission be abolished and that the operation of Center Ridge Arms be carried out through a "Bay County Department" under the Bay County Executive . . .
>
> RESOLVED      That the Bay County Board of Commissioners establishes the following transitional plan abolishing the Bay County Housing Commission effective December 9, 2003 at 2:00 p.m. and establishes a Bay County Housing Department to implement management of Center Ridge Arms in accordance with Bay County's unique status under 139 . . .

Defs.' Resp. [dkt # 45] Ex. 5, Res. 2003-220. All former employees of the Bay County Housing Commission, including Shimkus, were terminated by this resolution.

Bay County later rehired all members of the Housing Commission in positions with the housing department, except for Shimkus. The Commission hired a new executive director, Kathleen Baughman, who began employment April 10, 2004. The board of the new housing department does not have a member that resides in housing managed by the department.

On March 3, 2004, the plaintiffs filed a complaint in Bay County Circuit Court. The defendants removed the case to this Court on March 24, 2004 on the basis of federal question jurisdiction. Soon after, the Bay County Housing Commission filed a motion to dismiss the claims against it and the plaintiffs filed a motion for a preliminary injunction. The Court granted the motion to dismiss the Housing Commission as a defendant because it is not a legal entity, and denied the motion for a preliminary injunction. The plaintiffs amended their complaint, and then filed a second

amended complaint on June 7, 2004 seeking the relief described above.  After a period of discovery, the serial motions for summary judgment followed.

## II.  Housing Commission Claims

A motion for summary judgment under Fed. R. Civ. P. 56 presumes absence of a genuine issue of material fact for trial.  It is "appropriate [when] 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 565 (6th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  The plaintiffs and defendants all have moved for summary judgment on Counts II, III, IV, and V of the second amended complaint, which in one form or another aver that Bay County's operation of public housing outside the structure of a formally constituted housing commission is illegal.  Defendants Bay County and Hinkner also moved for summary judgment on Count I, Shimkus's whistleblower claim, contending that Shimkus was not employed or fired by the county, but rather the housing commission.  All of these claims have as their theoretical linchpin the legal proposition that Bay County cannot maintain a public housing facility unless it forms a housing commission, and before December 2003 a housing commission actually existed and employed Shimkus.  Summary judgment under Rule 56 is a useful method of addressing an issue when the parties' arguments suggest, as here, that there are no material facts in dispute and "the sole question at issue [is] a question of law."  *United States v. Donovan*, 348 F.3d 509, 511 (6th Cir. 2003); *see also Wachovia Bank v. Watters*, 431 F.3d 556, 559 (6th Cir. 2005); *Progressive Corp. and Subsidiaries v. United States*, 970 F.2d 188, 190-91 (6th Cir. 1992).

-17-

### A.  Whether a Housing Commission Existed in 2003

The first question presented by the parties' motions is whether Bay County operated a legally

formed and constituted housing commission before December 2003.  As noted above, there is no

dispute that a housing commission existed in the 1970s and that it was dissolved when Bay County

adopted the OUFCG.  Michigan Courts have held that the Michigan Constitution authorizes the

Michigan Legislature to permit counties to adopt the Optional Unified Form of County Government.

*Cnty Comm'rs of Oakland Cnty v. Oakland Cnty Exec.*, 98 Mich. App. 639, 648, 296 N.W.2d 621,

627 (1980).   Under this governmental form, a county has the power to create a department

authorized to perform functions of commissions that were abolished by adoption of the form.  *See*

*Bay Cnty Exec. v. Bay Cnty Bd. of Comm'rs*, 129 Mich. App. 707, 714, 342 N.W.2d 96, 99 (1983).

In *Bay County Executive*, the plaintiff sought a determination whether the County Executive or

Board of Commissioners controlled the civil counsel for the county.  When Bay County adopted the

OUFCG, the office of civil county counsel was abolished but was recreated as a county department.

The defendant argued that the Department of Corporation Counsel did not legally exist.  The court

held that the Department of Corporation Counsel had been properly created as a department under

the OUFCG and fell under the control of the executive pursuant to Michigan Compiled Laws section

45.554.  The court reasoned:

> The statutes clearly establish that the office of civil county counsel is one of the
> appointed boards, commissions, authorities, departments or elected officials
> abolished by M.C.L. § 45.554; M.S.A. § 5.302(54).  If it is to exist, then it must be
> as a function performed by "1 or more departments of the county." [Mich. Comp.
> Laws § 45.563].  The function need not be performed . . . and the county may
> continue to have its civil legal work performed by the prosecuting attorney.
> However, if the county elects to have civil counsel other than the prosecuting
> attorney, the county must set up the department under the same governmental
> structures that exist for all other county departments.

-18-

2:04-cv-10075-DML-CEB   Doc # 64   Filed 02/28/06   Pg 19 of 50   Pg ID 1196

*Id.* at 715, 342 N.W.2d at 100.

Counties that have adopted the OUFCG are empowered to create departments, and on recommendation of the county executive and majority vote of the county commissioners can consolidate departments and transfer functions from one department to another. That action can be taken without recommendation of the county executive by a two-thirds vote of the commissioners. *See* Mich. Comp. Laws § 45.564. However, there is no record of Bay County having taken such action after it dissolved the housing department through resolution number 80174 passed on June 10, 1980.

Counties also can create housing commissions as separate and independent public corporations. *See* Mich. Comp. Laws § 125.653. However, such a commission may be formed only by ordinance, which "shall not go into effect until 15 days after it has been published in a newspaper of general circulation in such city, village, township or county and posted in 3 public places in such city, village, township or county," Mich. Comp. Laws § 125.653(a), and it shall *not* go into effect if three percent of the voters petition for a referendum on the subject. *Ibid.* There is no evidence that Bay County took any action to form a housing commission under state law after it adopted the OUFCG in 1979.

Since there was no properly formed commission or department to operate Bay County's public housing project, the only remaining conclusion is that this function devolved upon the general county government. That is the consequence prescribed by the Michigan Legislature for counties transitioning to the OUCFG. "On the date the optional unified form of county government becomes effective, powers vested in abolished office, board, commission, authority, or department shall become general county government powers." Mich. Comp. Laws § 45.554(2). The Court

-19-

determines that Bay County was operating its public housing project under the authority of general county government after it dissolved the housing department in June 1980, despite its apparent attempt to operate under the organizational structure of a housing commission. Plaintiff Shimkus, therefore, was an employee of Bay County, and he was terminated by Bay County. Bay County's motion for summary judgment on Count I based on the theory that Shimkus was employed by some other entity, therefore, will be denied.

### B. Whether Bay County Was Required to Create a Housing Commission

The plaintiffs contend that if Bay County desires to a operate public housing project, it can do so only under the authority of a legally formed housing commission. As noted above, the Michigan Legislature has authorized municipalities, including counties, to form housing commissions. Mich. Comp. Laws § 125.653(a) (stating that "[a]ny city, village, township or county may create by ordinance, a commission with power to accomplish the purposes set forth in section 2 of this act"). The plaintiffs contend that the authority of the county to operate public housing does not exist independently, but it only can be conferred by legislative grant. The plaintiffs base this argument on the familiar principle that "the [county] board of commissioners possess no inherent constitutional power to act either legislatively or administratively, but receives such power through legislative enactment." *See Oakland Cnty Comm'r v. Oakland Cnty Exec.*, 98 Mich. App. 639, 650, 296 N.W.2d 621, 628 (1980); *see also Mason Cnty Civic Research Council v. Cnty of Mason*, 343 Mich. 313, 72 N.W.2d 292 (1955). True enough, but it does not follow that the county may operate its public housing *only* through a commission, especially upon examining the relevant legislation.

In addition to authorizing counties to form housing commissions, Michigan's Public Housing Act states:

> Any city, village, township or county of the state of Michigan may purchase, acquire, construct, maintain, operate, improve, extend or repair housing facilities and eliminate housing conditions which are detrimental to the public peace, health, safety, morals or welfare.

Mich. Comp. Laws § 125.652. Housing commissions may form governing boards, borrow funds, issue bonds, and enter contracts for the purpose of developing public housing. Counties may do the same without forming a housing commission. For instance, section 125.651 states:

> (a) "Borrower" means either of the following:
>
> (I ) The city, village, township, or county operating under this act.
> (ii) A commission created under this act if empowered by ordinance of the creating governing body to act as a borrower for purposes of issuing bonds or notes under this act.

Mich. Comp. Laws § 125.651(a). Later, the statute refers to such borrowers separately from commissions: "It is the purpose and intent of this act to authorize every borrower *or commission created by such borrower* to do any and all things necessary or desirable to secure the financial aid or cooperation of the federal government in the purchasing, acquiring, constructing, maintaining . . . of housing facilities." Mich. Comp. Laws § 125.696 (emphasis added). The statute also provides that "[n]o tenancy or contract right to occupy housing in a project or facilities operated by any city, village, township, or other unit of local government, as provided by this act, shall be terminated by the project management or the local housing commission except for just cause." Mich. Comp. Laws § 125.694a(1). State law plainly allows both counties and the commissions they create to operate public housing if they choose to do so.

Nor is there a federal requirement set forth in the applicable statutes or regulations that mandates the formation of an independent housing commission to administer federally-funded low income housing assistance projects. Federally-assisted low income housing projects are operated

by a "public housing agency." *See, e.g.* 42 U.S.C. § 1437a(a)(1) - (5). Federal law defines a "public housing agency" to include "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A). Counties have the option of acting as public housing agencies, or if permitted by state law, as here, they may but need not create independent authorities.

As noted above, Count II of the second amended complaint alleges that the termination of Shimkus is void because it was achieved by the county board of commissioners and not a housing commission; Count III seeks mandamus compelling the county executive to form a housing commission; and part of Count IV seeks relief through 42 U.S.C. § 1983 for violating the right created by section 1437 to require public housing to be locally administered by a separate commission. Because the legal premise underlying these counts is that Bay County can operate a public housing project only through a separate commission, and that premise is false, the plaintiffs' claims must fail. Therefore, the Court will grant summary judgment to the defendants and dismiss those parts of the second amended complaint, and deny the plaintiffs' motion for summary judgment claiming a right to affirmative, declaratory, and injunctive relief as a matter of law.

### C. The Requirement of a Tenant Commission Member

There remains the question raised by Counts III and IV whether the County must have a tenant as a member of the governing board of that public housing agency. The United States Housing Act was amended effective October 21, 1998 by the Quality Housing and Work Responsibility Act of 1998, Pub. L. No. 105-276, 112 Stat. 2522 (1998), also known as the Public Housing Reform Act, to include a provision that governing boards of public housing agencies

-22-

include at least one person "directly assisted" by the agency, meaning a resident of housing

maintained by the agency.  *See State ex rel. Lorain Metro. Housing Authority Bd. of Comm'rs v.*

*Mayor of City of Lorain*, 145 F. Supp. 2d 926, 930 (N.D. Ohio 2001).  Section 505 of the Act

amended 42 U.S.C. § 1437(b) to read:

> Except as provided in paragraph (2), the membership of the board of directors or
> similar governing body of each public housing agency shall contain not less than 1
> member–
> (A) who is directly assisted by the public housing agency; and
> (B) who may, if provided for in the public housing agency plan, be elected by the
> residents directly assisted by the public housing agency.

42 U.S.C. § 1437(b)(1).  Michigan law tracks this requirement as well.  *See* Mich. Comp. Laws

§125.654(1) & (2) (stating that a housing "commission shall consist of 5 members" and "[o]ne

member of the commission shall be a tenant of public or subsidized housing as provided in this

subsection").

The defendants argue that the plaintiffs have no standing to bring this claim and the federal

statute does not create a personal right that the plaintiffs can enforce through section 1983.  The

Court believes that the plaintiffs likely meet the three constitutional requirements for standing,  *see*

*McConnell v. Fed. Elections Comm'n*, 540 U.S. 93, 225-26 (2003) (reiterating that "the irreducible

constitutional minimum of standing" consists of "an injury in fact, which is concrete, distinct and

palpable, and actual or imminent," "a causal connection between the injury and the conduct

complained of – the injury has to be fairly traceable to the challenged action of the defendant, and

not the result of some third party not before the court," and a "substantial likelihood that the

requested relief will remedy the alleged injury in fact"), as well as the prudential requirements. *See*

*Nat'l Solid Wastes Mgmt. Ass'n v. Daviess County, Ky.*, 434 F.3d 898, 901-02 (6th Cir. 2006)

(noting that a "[p]laintiff must demonstrate that the interest that it seeks to protect is "'within the

zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'") (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)).  In addition, public housing management, such as plaintiffs Shimkus and Marzejon, have been permitted to enforce the required membership provision of section 1437.  *See Tillim v. Huntington Hous. Auth.*, 97 F. Supp. 2d 290 (E.D.N.Y. 2000).

The plaintiffs' claims in these counts must fail, however, because the statutory provisions cannot be read to encompass the defendants in this case.  As explained earlier, the public housing agency in Bay County is the county government itself.  According to state law, the "governing body" is, "in the case of a county, the board of supervisors or county commissioners." Mich. Comp. Laws § 125.651(d).  County commissioners are elected officials who serve full time and are paid a salary.  The federal statute contains an exception to the tenant membership requirement when "members of the board of directors or similar governing body of a public housing agency [are] salaried and . . . serve on a full-time basis."  42 U.S.C. § 1437(b)(2).  Moreover, the state law tenant member requirement applies only to housing commissions established in accordance with the provisions of the Housing Act.  *See* Mich. Comp. Laws §125.654(2).  Consequently, Count III and that part of Count IV of the second amended complaint that seeks to enforce the tenant member requirement of section 1437 fail as a matter of law, and the Court will grant the defendants' motions for summary judgment seeking their dismissal.

### III.  Misconduct Claims Against County Commissioner Defendants

The defendants also have moved for summary judgment on Counts V and VI of the second amended complaint, arguing that there is no private right of action under the incompatibility of

office statute, and the plaintiffs do not have taxpayer standing to challenge the payment of excess expenses to the defendants.  The Court agrees with both of these arguments.

The state statute that forbids "a public officer or public employee" from holding "2 or more incompatible offices at the same time," Mich. Comp. Laws § 15.182, has a companion provision that states:

> The attorney general or a prosecuting attorney may apply to the circuit court for Ingham county or to the circuit court for the county in which the alleged act or practice in violation of this act is alleged to have occurred or in which a party to the alleged violative act or practice resides, for injunctive or other appropriate judicial relief or remedy.  *However, this act shall not create a private cause of action.*

Mich. Comp. Laws § 15.184 (emphasis added).  Michigan courts have held that the statute means exactly what it says: private individuals may not bring actions to enforce this law.  In *Detroit Area Agency on Aging v. Office of Services to the Aging*, 210 Mich. App. 708, 711, 534 N.W.2d 229, 231 (1995), the plaintiff alleged "that the commission's approval of the new funding formula was unlawful and void because eight commissioners were ineligible to vote because they held incompatible public offices and acted under actual or potential conflicts of interest in violation of the incompatible public offices act, M.C.L. § 15.181 et seq."  *Id*. at 711, 534 N.W.2d at 231.  The court held:

> Finally, but not least significant, plaintiff lacked standing to raise the issue of incompatibility in the trial court.  M.C.L. § 15.184; M.S.A. § 15.1120(124) specifically provides that an action for incompatibility may be brought by the Attorney General or a prosecuting attorney and that there is no private cause of action under the incompatible public offices act.  Where a new right or a new duty is imposed by statute, the remedy provided by the statute for enforcement of the right or for nonperformance of the duty is exclusive unless the remedy is plainly inadequate. *Forster v. Delton School Dist.*, 176 Mich.App. 582, 584, 440 N.W.2d 421 (1989).
>
> Plaintiff was not precluded from communicating its concerns to the Attorney General's office or to the local prosecutor.  These parties, being specifically

-25-

> designated by the Legislature to act in situations such as these, are sufficiently
> capable of forwarding plaintiff's grievance in the appropriate forum when the
> circumstances so dictate.  Because plaintiff is not without an adequate remedy, we
> conclude that it lacked standing to raise the incompatibility issue in the trial court.
> *Id.*; M.C.L. § 15.184; M.S.A. § 15.1120(124).

*Id.* at 716-17, 534 N.W.2d at 234.  The plaintiffs have no right to maintain their action against

defendants Lutz, Poirier, Bryne, and Gwizdala for serving on the housing commission at the same

time they held the office of county commissioner.  Therefore, the defendants' motion for summary

judgment seeking dismissal of Count VI of the second amended complaint will be granted.

The statute upon which the plaintiffs base their claims in Count V is Michigan Compiled

Laws § 125.654(4), which states:

> A member of the commission may receive compensation for actual expenses
> incurred in serving as a member of the commission in an amount determined by the
> commission. The governing body of an incorporating unit may adopt a resolution
> establishing limitations on the amounts of actual expenses that may be paid to a
> member of a commission.

The plaintiffs claim they are damaged as taxpayers of Bay County by the practice of reimbursing

housing commissioners by payment of a flat fee of $35 per meeting rather than paying them their

actual expenses incurred.

The right of the plaintiffs to sue the defendants for receiving a flat fee per housing

commission meeting instead of the statutorily authorized payment of actual expenses (Count V)

depends on the plaintiffs' ability to establish standing as taxpayers.  The Sixth Circuit has described

taxpayer standing under Michigan law as follows:

> Under Michigan law, a taxpayer has standing to sue if he can show a "threat that he
> will sustain substantial injury or suffer loss or damage as a taxpayer, through
> increased taxation and the consequences thereof."  *Menendez v. City of Detroit*, 337
> Mich. 476, 60 N.W.2d 319, 323 (1953) (noting that this prerequisite "is uniformly
> true of all the Michigan cases considering this subject"); *Rayford v. City of Detroit*,
> 132 Mich. App. 248, 347 N.W.2d 210, 215 (1984).  "The plaintiff must allege with

-26-

particularity how the alleged illegal act will" cause injury through increased taxation.
*Killeen v. Wayne County Rd. Comm'n*, 137 Mich. App. 178, 357 N.W.2d 851, 856
(1984). In *Killeen*, the court denied standing to the plaintiffs because their
allegations of increased taxation resulting from a collective bargaining agreement
between a county road commission and a labor organization were "general,
conclusory and speculative." *Id.*

*Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 542 (6th Cir. 2002). In that case,

the plaintiff alleged that the defendant "authorized and entered unlawful contracts calling for the

expenditure of public funds." *Ibid*. The court found that the plaintiff "fail[ed] to allege with

particularity how the . . . contract . . . will cause it to suffer loss or damage as a taxpayer." *Ibid*. The

court also found that the plaintiff failed "to provide 'a clear statement of present or prospective

damages to taxpayers'" because the winner of the contract bid at issue would bear the costs of the

damages alleged, not the defendant. *Ibid*. (citing *Kaminskas v. City of Detroit*, 68 Mich. App. 499,

243 N.W.2d 25, 27 (1976)).

The only plaintiff who alleges status as a taxpayer is Robert Shimkus. Second Am. Compl.

¶ 116. In his brief, he quotes language from a number of Michigan court decisions implying a

relaxed standard for pleading taxpayer damages based on either threatened or assumed injury or

illegal use of funds. For instance, in *Central Bitulithic Paving Co. v. Manistee Circuit Judge*, 132

Mich. 126,129, 92 N.W. 938, 939 (1903), the Michigan Court stated that "[i]t is sufficient to say that

if corruptly made, and if the taxpayers of the city will suffer loss thereby, equity may and ought to

interfere reasonably to restrain the illegal action." In *McManaus v. City of Petoskey*, 164 Mich.

390, 129 N.W. 681 (1911), the court allowed a taxpayer to file claims to enjoin the threatened

misuse of taxpayer funds. And in *Thomas v. Board of Supervisors*, 214 Mich. 72, 182 N.W. 417

(1921), the court allowed a taxpayer to bring suit "to test the right or power of the county to establish

and maintain a tract index and to make and furnish abstracts of title to lands in that county." *Id*. at

-27-

74-75, 182 N.W. at 418.  The Court held that "a taxpayer in the situation of the complainant is entitled to maintain a suit to restrain the illegal action of a municipality in the expenditure of money." *Id*. at 91, 182 N.W. 417 at 422.  Consistent with these themes, the plaintiff cites a host of additional cases without further developing legal concepts or applying the law to the facts of the case: *Grand Rapids Independent Publishing Co. v. City of Grand Rapids*, 335 Mich. 620, 56 N.W.2d 403 (1953) (denying taxpayer standing); *Menendez v. City of Detroit*, 337 Mich. 476, 60 N.W.2d 319 (1953) (denying taxpayer standing); *Thompson v. City of Dearborn*, 347 Mich. 365, 79 N.W.2d 841 (1956); *Kaminskas v. City of Detroit*, 68 Mich. App. 499, 243 N.W.2d 25 (1976) (denying taxpayer standing).

However, Shimkus's exposition of Michigan case law involving taxpayer standing does not indicate any different standard than the one stated in *Michigan Paytel Joint Venture v. City of Detroit* for determining whether a taxpayer has standing.  "'The plaintiff must allege with particularity how the [official conduct] will' cause injury through increased taxation." 287 F.3d at 542.  Allegations that are "general, conclusory and speculative" are insufficient to demonstrate standing. *Ibid*.  Here, Shimkus's claims are insufficient because, although he has identified how the payment may not adhere explicitly to the statute, he has not shown that he will suffer loss by the flat fee.  Shimkus makes no particular allegation of how the flat fee per meeting overcompensates board members for their actual expenses.  The claim that a flat fee of $35 per meeting will result in increased taxes, without more, is mere speculation: the fee could easily be a bargain for the taxpayers.  Even if he had alleged that meetings vary in length or that the expenses of different board members vary, he has not alleged how a $35 fee per meeting overcompensates members for their actual expenses or causes more than a *de minimis* loss that has but a negligible impact on an

-28-

individual taxpayer.  Shimkus further contends that standing is sufficient if injury is threatened.  However, he has not stated in a non-speculative manner a threatened injury that differs from the injury he alleges already occurred, particularly since the ill-begotten housing commission has been disbanded and the housing activities are administered under the authority of general county government.  The motions for summary judgment as to Count VI of the second amended complaint will be granted.

### IV.  Shimkus's Retaliation Claims

Shimkus also contends in his second amended complaint that county officials, specifically County Executive Hinkner and County Commissioners Lutz, Poirer, Byrne, and Gwizdala, retaliated against him for speaking out about the irregularities in the housing commission governance.  He says that the failure to return him to his job as housing director after the housing commission was dissolved violated Michigan's Whistleblower's Protection Act, Mich. Comp. Laws § 15.361 *et seq*., and amounted to a violation of his rights under the First and Fourteenth Amendments giving him a cause of action under 42 U.S.C. § 1983.  The defendants raise several arguments in opposition to these claims.

#### A.  *Whistleblower Claim*

Michigan's Whistleblower's Protection Act prohibits an employer from "discharg[ing], threaten[ing], or otherwise discriminat[ing] against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law."  Mich. Comp. Laws § 15.362.  The statute contains a ninety-day statute of limitations, which defendants Lutz, Poirer, Byrne, and Gwizdala claim was

-29-

violated because they were not joined until the second amended complaint that was filed outside the ninety-day period. However, the plaintiff concedes that these defendants were not his "employer" within the meaning of the Act, and therefore does not contest dismissal of the whistleblower count against them.

According to the statute, "'[e]mployer' means a person who has 1 or more employees. Employer includes an agent of an employer and the state or a political subdivision of the state." Mich. Comp. Laws § 15.361. Defendants Bay County and Hinkner contend that they were not Shimkus's "employer" because he worked for the housing commission, not the county. That argument was rejected earlier because there was no properly constituted "housing commission" in 2003, and Shimkus, in effect, worked for Bay County. Moreover, even if the Housing Commission is properly considered the employer of the plaintiff – a proposition that the Court cannot accept – the county "expressly accept[ed] . . . Assignment of all the HC's [housing commission's] obligations, responsibilities and duties . . . and agree[d] to perform all the duties, obligations and covenants." Defs.' Bay County and Hickner Resp. [dkt # 45] Ex. 5, Assignment and Transfer Agreement. The county bears the liability of employing the plaintiff Shimkus because the county committed to assume "all" the commission's "obligations, responsibilities and duties." *Ibid*. Without any limiting language, this term of the agreement includes responsibility for any discriminatory and illegal actions of the commission before the transfer agreement.

Defendants Bay County and Hinkner also argue that Shimkus has failed to offer sufficient evidence on all the elements of his whistleblower claim because Shimkus did not promptly report the violation, Marzejon had already reported the violations to HUD, Shimkus only reported the violations after his own performance had been questioned, and Shimkus testified that he reported

-30-

in part to make the Commission more responsive to residents' concerns, not to inform the public on matters of public concern. They contend that they are entitled to summary judgment on this claim.

When adjudicating a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court views the evidence and "'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). Once the moving party has made the "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-moving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex*, 477 U.S. at 324; *Hall v. Tollett*, 128 F.3d 418, 421-22 (6th Cir. 1997). The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). He must "do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court believes that plaintiff Robert Shimkus has met his burden on the whistleblower claim, at least with respect to defendant Bay County.

In order to prevail on a claim under Michigan's Whistleblower Protection Act, a plaintiff must demonstrate that "(1) he was engaged in protected activity as defined by the act; (2) the defendant discharged him, and (3) a causal connection exists between the protected activity and the

discharge." *Chandler v. Dowell, Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 212 (1998);

*see also* Mich. Comp. Laws § 15.362.  An individual engages in a "protected activity" when he:

> (1) reports a violation or suspected violation of a law or regulation to a public body,
> (2) is about to report such a violation to a public body, or (3) is asked by a public
> body to participate in an investigation.

*Trepanier v. Nat'l Amusements, Inc.*, 250 Mich. App. 578, 583, 649 N.W.2d 754, 757 (2002).  To

have engaged in a protected activity under the Whistleblower's Protection Act, the plaintiff

reasonably must believe a violation of law, regulation, or rule has occurred.  *See Melchi v. Burns,*

*Int'l Sec. Serv. Ind.*, 597 F. Supp. 575 (E.D. Mich. 1984).  A Michigan court has considered an

employer's decision to lay off an employee to constitute a discharge within the meaning of the

statute, and the reasons for the layoff are assessed when evaluating the employer-defendant's

legitimate reason for the discharge.  *McLemore v. Detroit Receiving Hosp.*, 196 Mich. App. 391,

396-97, 493 N.W.2d 441, 443-44 (1993) (holding that "[t]he core issue in this case was the

defendant's motivation for eliminating the plaintiff's job.  Plaintiff did not dispute that defendant

hospital's financial distress was genuine, and that some jobs would have to be eliminated").  Under

the third element of the whistleblower claim, the motivation of an employee reporting a suspected

violation "must be a desire to inform the public on matters of public concern."  *Shallal v. Catholic*

*Soc. Servs. of Wayne County*, 455 Mich. 604, 621, 566 N.W.2d 571, 579 (1997).  Otherwise, the

plaintiff cannot "establish a causal connection between her actions and her firing."  *Ibid*.  The

Michigan Supreme Court explained:

> Many courts have held that a plaintiff is precluded from recovering under a
> whistleblower statute when the employee acts in bad faith. *See, e.g., Melchi v. Burns
> Int'l Security Services*, Inc., 597 F. Supp. 575 (E.D. Mich. 1984), *Wolcott v.
> Champion Int'l Corp.*, 691 F. Supp. 1052  (W.D. Mich. 1987). The primary
> motivation of an employee pursuing a whistleblower claim "must be a desire to

-32-

> inform the public on matters of public concern, and not personal vindictiveness." *Id*.
> at 1065.

*Id.* at 621-22, 566 N.W.2d at 579.

Shimkus's report to HUD that housing commissioners were serving in violation of the incompatibility of office statute and receiving improper expense reimbursement was sufficiently prompt to avoid summary judgment. The defendants contend that Shimkus knew of the violations because he had been Housing Commission Director since 1997, but he waited until it would benefit him personally to report the violations. Although Shimkus knew that individuals served on both the county commission and Housing Commission, he testified that he only waited to make his report until he knew that such service was a violation of law. He came upon this knowledge, he says, after examining the Michigan attorney general's website, although he could not remember when that occurred. In other parts of his deposition, he testified that he learned of the alleged county commissioner violations around the end of September. Defs.' Bay County and Hickner Second Mot. Summ. J. [dkt # 50] Ex. 3, Pl.'s Dep. at 43-44; Pls.' Resp. [dkt #54] Ex. 1, Pl.'s Dep. at 87-88. Other evidence suggests that he learned of the violations sooner than September: he attended meetings in June, July, and August in which Marzejon made complaints against the county commissioners. Therefore, there is some evidence of delay but not as significant a delay as in *Shallal*. Further, unlike Shallal, the plaintiff here actually assisted Marzejon and made the allegations against the county board of commissioners to HUD.

The defendants allege that Shimkus did not intend to expose the violation publically because he only reported the violation when his job was threatened. There is evidence that the plaintiff thought the members of the Housing Commission were trying to have him removed. However, the circumstances of his participation in the complaint against the commission members do not resonate

-33-

with vindictiveness or an intent to extort.  The plaintiff did not threaten his employers with the allegation when they began to question his performance.  *See Trepanier*, 250 Mich. App. at 587-88, 649 N.W.2d at 759 (holding that "plaintiff did not use his protected activity to extort his employer, as did the plaintiff in *Shallal*.  Further, although plaintiff's primary purpose may have been to protect himself and his girlfriend from harassment, reasonable jurors could conclude that plaintiff was acting in the public's interest, in addition to his own").  Instead, he worked with Marzejon and HUD to correct what he perceived to be a problem in the functioning of county government.  He testified:

> I thought that if they had a commission that were responsive to the residents instead of responsive to Bay County, having a commission that felt they were responsible to the residents instead of responsible to the county, that it would be beneficial to the residents.  Somebody who cared about the residents instead of caring about the county.  Not to have commissioners in dual roles as housing commissioners and county commissioners, receiving $35 a month in pay as opposed to actual expenses, and the fact, the hiring process.

Pls.' Resp. [dkt #54] Ex. 1, Pl.'s Dep. at 80-81.  Taking this evidence in the light most favorable to the non-movant, a reasonable finder of fact could conclude that Shimkus's interests were aligned with the public in reporting the perceived illegality in the Housing Commission management.  There is an issue of fact concerning whether he had a desire to inform the public when helping Marzejon and reporting the violations to HUD.

Nor is Shimkus denied protection of the statute because he made his allegations after Marzejon.  The statute contemplates protection for employees before a report is actually made by protecting employees about to report, and after a report is made by protecting employees asked to participate in investigations.  Mich. Comp. Laws § 15.362.  Therefore, the statute implicitly provides protection for another individual's reporting activities even after an illegality has been made public.  Moreover,  Michigan Courts interpret the statute broadly.  *See Trepanier*, 250 Mich. App. at 583-

-34-

84, 649 N.W.2d at 757-58.  This broad protection encompasses Shimkus's acts of helping Marzejon make the allegation complaining of the violations and later sending his own letter, which constituted a "report" within the meaning of the statute.  *See ibid*. (noting that broad protection of statute applies to individuals who make reports against co-workers and outside the employment setting, and "declin[ing] to interpret the WPA so as to create a limitation that is not apparent in the unambiguous language of the statute").

The defendants also argue that Shimkus did not suffer adverse employment action because his job was eliminated when the housing commission was dissolved and he did not apply for the new housing director job.  That argument cannot withstand scrutiny.  It is well established that the lay-off of Shimkus constituted a discharge – a discriminatory act – within the meaning of the Whistleblower's Protection Act.  *McLemore*, 196 Mich. App. at 396-97, 493 N.W.2d  443-44 (holding that a jury question arose from the plaintiff's contention that "her job was selected [for elimination] because defendants wanted to get rid of her for making a discrimination charge" and that "evidence supports the inference that in eliminating her position, defendants merely took advantage of an opportunity to do what they had been preparing to do, and that the economic necessity was a pretext").  In this case, a fact question is presented by the lay-off of all employees of the Housing Commission and then rehiring all of them except Shimkus.  Moreover, a constitutional violation can arise when a county terminates a contract in a way that would "chill a person of ordinary firmness from continuing to engage" in protected activity.  *Ebelt v. Cnty of Ogemaw*, 231 F. Supp. 2d 563 (E.D. Mich. 2002).  The plaintiff did not have to reapply for a position where termination was improper and a pre-existing relationship existed.  *Id*. at 572.

Lastly, the defendants argue that there is no proof of a causal connection between Shimkus's reports and the failure to rehire him because there is no evidence that the defendants knew of Shimkus's activities when the alleged discharge occurred, and the defendants had a legitimate business reason for the alleged discharge: the Housing Commission was illegal and Shimkus had performance issues. Hickner described the alleged performance problems in an affidavit:

> 9. This affiant was advised of performance deficiencies and negative work history regarding Mr. Shimkus, including the fact that there had been complaints from HUD regarding Mr. Shimkus' failure to file documents and failure to respond to phone calls. Additional information regarding Mr. Shimkus that had been provided to this affiant prior to December 9, 2003, included the fact that Mr. Shimkus had been terminated from his previous job, and the fact that the County had received a[n anonymous] complaint regarding Mr. Shimkus from a frequent visitor of Center Ridge Arms.

Defs.' Bay County and Hickner Second Mot. Summ. J. [dkt # 50] Ex. 15, Thomas Hickner Aff. ¶ 9.

The Court agrees that there is not evidence that Hinkner was aware of Shimkus's activities concerning notification to HUD or that Hinkner was motivated as Bay County's agent by anything other than Shimkus's performance when the decision was made to change housing directors. However, Hinkner was not Bay County's only agent; Lutz also was involved and had threatened Shimkus if he became involved with Marzejon's complaints. The Court concludes, therefore, that there is sufficient evidence to make out a jury question whether Bay County's decision to terminate was motivated, at least in part, by retaliation for reporting a violation of law. In *McLemore*, the court found there was a disputed issue of fact concerning causation based on evidence that the defendant criticized the plaintiff for problems outside the plaintiff's control, expressed dissatisfaction for performance that had previously received praise, and offered positions to the plaintiff's laid-off co-workers. *McLemore*, 196 Mich. App. at 397-98, 493 N.W.2d at 444. The

-36-

court held that the defendant's reasons for the lay-off and documented history of the plaintiff's poor performance were not dispositive of whether the termination was lawful. *Ibid*. Here, there is a similar issue of fact. There is evidence that Shimkus's alleged performance problems were not sufficient to motivate the discharge. The investigation into HUD's complaints against Shimkus and the accountant's report did not conclude that his performance was deficient, although it did recommend some areas for improvement. The timing of the anonymous tip is suspect; it occurred on the same day as a Housing Commission meeting after the plaintiff informed Lutz that he assisted Marzejon. The letters from Lutz critiquing the plaintiff demonstrate that the defendant expressed concern over the plaintiff's performance, but do not establish conclusively the absence of discrimination. The affirmative evidence supports a conclusion that retaliation occurred: the defendant county offered positions to all other Housing Commission personnel except the plaintiff; and the head of the Housing Commission, Lutz, threatened Shimkus to keep him from reporting the issues raised by Marzejon, shortly after which he was terminated. *See Taylor v. Modern Eng'g, Inc.*, 252 Mich. App. 655, 661, 653 N.W.2d 625, 629 (2002) (holding that "[c]lose timing between alleged protected activity and the termination of a plaintiff's employment may establish the 'causal connection' element of a plaintiff's prima facie case of retaliation").

The motions for summary judgment seeking dismissal of the whistleblower count will be granted as to all defendants except Bay County. That claim will proceed to trial against that defendant.

### B.  Section 1983 Claims

#### 1.  Proof of Elements of the Constitutional Claims

Plaintiff Shimkus's claims that the defendants violated his constitutional rights are brought pursuant to 42 U.S.C. § 1983, under which the plaintiff must prove (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law.  *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003). Since the plaintiff was a municipal employee, there is no dispute over the second component.  The defendants argue that Shimkus cannot prove a violation of the Due Process Clause because he was an at-will employee and he had no property interest in continued employment that was protected by the Constitution.

It is well established that "[a]n at-will public employee does not have a property interest in continued employment unless it can be shown that the employee had a reasonable expectation that termination would be only for good cause."  *Gregory v. Hunt*, 24 F.3d 781, 785 (6th Cir. 1994). However, the plaintiff contends not that he had a property interest in continued employment, but rather he enjoyed an interest in the nature of a liberty interest in having his supervisor determine by a preponderance of evidence that he was not terminated due to his whistle-blowing activity.

The Sixth Circuit has recognized that a "protected liberty entitlement can also be created by state law . . . .  When a liberty interest has been created, the due process clause acts to insure that the state-created right is not arbitrarily abrogated."  *Bills v. Henderson*, 631 F.2d 1287, 1291 (6th Cir. 1980); *see also Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir. 1986) (observing that "a State creates a protected liberty interest by placing substantive limitations on official discretion").  The plaintiff contends that Michigan Compiled Laws section 15.342b entitles him to an interest protected

-38-

by the Due Process Clause.  That statute states that a public employee may report a violation of the

Standards of Conduct of Public Officers and Employees Act and "shall not be subject to [certain]

sanctions because they reported or were about to report a violation."  The statute states:

> Whenever a public officer or employee who has reported or who intends to report a violation of section 2 may be subject to any of the sanctions under this section for reasons other than the public officer's or employee's actions in reporting or intending to report a violation of section 2, the appointing or supervisory authority before the imposition of a sanction shall establish by a preponderance of evidence that the sanction to be imposed is not imposed because the public officer or employee reported or intended to report a violation of section 2.

Mich. Comp. Laws § 15.342b(2).

It plainly appears that under the Standards of Conduct of Public Officers and Employees Act,

an appointing or supervisory authority must determine that an employment sanction of an individual

that reports or intends to report a violation will not occur for the purpose of retaliation.  However,

this statute does not create a due process right.  Sixth Circuit precedent provides that "[t]he creation

of procedural rights does not *ipso facto* create any property interest . . . [because] process is not an

end in itself."  *Levin v. Childers*, 101 F.3d 44, 46 (6th Cir. 1996).  The purpose of process "is to

protect a substantive interest to which the individual has a legitimate claim of entitlement.  And an

expectation of receiving process is not, without more, a liberty interest protected by the Due Process

Clause."  *Ibid.* (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)).  Therefore, "State-created

procedural rights that do not guarantee a particular substantive outcome are not protected by the

Fourteenth Amendment, even where such procedural rights are mandatory."  *Tony L. v. Childers*,

71 F.3d 1182, 1185 (6th Cir. 1995) (cited in *Levin*, 101 F.3d at 46).

In this case, the statute upon which Shimkus relies as the source of his liberty interest

provides "the appointing or supervisory authority before the imposition of a sanction shall establish

-39-

by a preponderance of evidence that the sanction to be imposed is not imposed because the public

officer or employee reported or intended to report a violation." Mich. Comp. Laws § 15.342b(2).

It entitles the plaintiff to a determination that an employment sanction as defined by the statute is

not for an improper reason, and that is all. There is no protectible liberty interest that can be derived

therefrom. *See Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 769 (6th Cir. 2004) (holding that

an at-will public employee "had no protectible property interest in her continued employment. For

that reason, the district court properly awarded summary judgment in favor of the defendants on [the

plaintiff's] due process claims").

The Court will grant the defendants' motion for summary judgment on Count IV of the

plaintiffs' second amended complaint insofar as it relies upon the Fourteenth Amendment as the

source of the federal rights allegedly violated.

The defendants also argue that Shimkus's section 1983 claim based on the First Amendment

must fail because his statements did not constitute protected speech, dissolving the housing

commission and not rehiring him was not adverse action, and there is no evidence that the failure

to rehire Shimkus was causally related to his speech. The individual defendants also claim that they

are entitled to qualified immunity.

The arguments that there was no adverse employment action and no proof of causation

mirror those same arguments made in connection with the whistleblower claim, and they are rejected

here as well. Moreover, Supreme Court decisions have long held that the decision not to re-hire on

the basis of an individual's speech or beliefs can constitute an adverse employment action. *See, e.g.,*

*Branti v. Finkel*, 445 U.S. 507, 515 (1980) (noting that "this Court has specifically held that the

nonrenewal of a nontenured public [employee's] one-year contract may not be predicated on his

-40-

exercise of First and Fourteenth Amendment rights"). Similarly, the defendants have brought forth evidence that they would have taken the same action due to the plaintiff's performance regardless of the plaintiff's speech or because of the legal requirement that the County could not operate an independent Housing Commission. However, "this . . . burden 'involves a determination of fact' and ordinarily is 'reserved for a jury or the court in its fact-finding role.'" *Rodgers*, 344 F.3d at 603 (quoting *Perry v. McGinnis*, 209 F.3d 597, 604 n.4 (6th Cir. 2000)).

The Sixth Circuit has provided differing iterations of the elements of a First Amendment claim under section 1983. *Compare Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (requiring proof of constitutionally protected activity, adverse action, and causation) *with Rodgers*, 344 F.3d at 596 (requiring proof that speech addressed a matter of public concern, balancing the public employee's interest in speech against the government employer's interest in promoting efficiency, and a showing that speech motivated some adverse action against the public employee). These formulations are not necessarily inconsistent but rather organize the components of a First Amendment claim differently. The Court finds the formulation stated in *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), to be useful:

> A public employee who would succeed on a claim of retaliation in violation of the First Amendment must demonstrate (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted); *see also Mt. Healthy*, 429 U.S. at 287.

*Ibid.*

-41-

The first element, whether the plaintiff's speech was a constitutionally protected activity, is divided into the two sub-elements referenced in *Rodgers*. The first sub-element of the test – "whether the relevant speech addressed a matter of public concern," *Rodgers*, 344 F.3d at 596 – seeks to draw a line between issues "relating to any matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 146 (1983), and those that largely reflect the "quintessential employee beef" about incompetent or insensitive management. *Jackson v. Leighton*, 168 F.3d 903, 911 (6th Cir. 1999). The second sub-element invokes the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), calling upon the court to determine whether the employee's interest in speaking as he did outweighed the defendants' interests in keeping him silent. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Connick*, 461 U.S. at 147-50). The factors to be considered in weighing the parties' respective interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

"Matters of public concern include speech that 'relat[es] to any matter of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 146). Such speech calls attention to the functioning of government, misconduct of public employees or officials, or breaches of public trust. *See Connick*, 461 U.S. at 148; *Rodgers*, 344 F.3d at 596 *Brandenburg*, 253 F.3d at 898. However, mere mention of a public issue alone is not determinative of whether the speech is protected. When distinguishing public complaints about official misconduct from the "quintessential employee beef," the court must examine the context in which

-42-

it was made.  The court of appeals summarized the task in *Farhat*: "our circuit has distilled the 'public concern' test by stating that the court must determine: the 'focus' of the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker.'"  *Farhat*, 370 F.3d at 592 (citations omitted).  Also, the court of appeals has noted, "even if a public employee were acting out of a private motive with no intent to air her speech publicly . . . so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern." *Cockrel v. Shelby Cnty Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir 2002).

When balancing the public employer's interests in efficient operations against the employee's speech interests as required by *Pickering*, the court considers whether "an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees."  *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994).  The balancing test focuses "on the disruption resulting from the speech itself, not other events."  *Ibid*.

In determining whether there is sufficient evidence to warrant a trial on the causation element, "th[e] analysis focuses on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected activity."  *Sowards v. Loudon Cnty*, 203 F.3d 426, 431 (6th Cir. 2000).  The temporal proximity between the complaint and the termination can demonstrate discriminatory animus.  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004).

The plaintiff alleges his speech relates to two items of public concern: the service of the county commissioners on the housing commission board in possible violation of state law, which he communicated to Marzejon and to HUD; and the violation of housing commission hiring by-laws, which he communicated to Lutz.  The plaintiff testified that he was secretly helping Marzejon in October, Pl.'s Dep. at 44-45, but he informed Lutz of his speech during a conversation with Marzejon present:

> Jan was there, and he [Lutz] was talking about, he asked me if I received any correspondence from HUD, and I said, yes, I received a letter.  He said, do you have a copy of the letter?  I said, yes, I do.  I don't have it handy.  He said, have you been in contact with HUD?  I said, yes, I have, that I have been in contact with them and that, as I mentioned before, that I told them that the commissioners had been receiving pay for attending commission meetings, that they are also serving as housing commissioners and county commissioners, which is in violation of Public Act 18.  And Jan was there when I said that.

Defs.' Bay County and Hickner Second Mot. Summ. J.  [dkt # 50] Ex. 2, Pl.'s Dep. at 60; *see* Ex. 3, Pl.'s Dep. at 49 (describing the allegations he conveyed to HUD).  Although the hiring decision in violation of the by-laws as alleged does not violate law, *id.* Ex. 4, Pl.'s Dep. at 45, it does relate to how the county government functioned during the time that the county commissioners served as housing commissioners.  The speech relates to the functioning of government and breaches of public trust, making the speech a matter of public concern.  The defendants submit evidence that the focus of the speech may have been an attempt by Shimkus at revenge or to protect his employment.  Marzejon had already communicated the information for months with no support from the plaintiff, and the plaintiff said he told HUD that the housing commission was trying to be rid of him.  However, other evidence demonstrates that the focus of the speech may not have been the plaintiff's personal problems with the housing commission.  Soon after the plaintiff contacted HUD in support of Marzejon's allegations, HUD issued the letter requiring the county commissioners to vacate their

positions on the housing commission.  Shimkus testified that he was "flabbergasted" when he learned of an attorney general opinion that indicated that positions of county commissioner and housing commissioner were incompatible, and he expressed his concern when speaking on how the county commissioners were running the public housing. Pls.' Resp. [dkt 54] Ex. 1, Pl.'s Dep. at 90. He said:

> I thought that if they had a commission that were responsive to the residents instead of responsive to Bay County, having a commission that felt they were responsible to the residents instead of responsible to the county, that it would be beneficial to the residents.  Somebody who cared about the residents instead of caring about the county.

Defs.' Bay County and Hickner Second Mot. Summ. J. [dkt # 50] Ex. 2, Pl.'s Dep. at 72.  Therefore, there is an issue of fact whether the speech focused on a matter of public concern.

There is no evidence that the speech of the plaintiff interfered with the efficient operations of the government under *Pickering*.  Moreover, the defendants make no argument that there was a disruption caused by the plaintiff's speech.

### 2. Municipal Liability

Defendant Bay County also argues that the plaintiff has not established municipal liability under section 1983.  State political units cannot be held vicariously liable for a constitutional violation under section 1983 solely on a theory of *respondeat superior*.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978).  However, the Supreme Court has held that municipal liability will be found when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."  *Id.* at 690.  Moreover, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Court held that a political unit can be held liable under section 1983 for a decision by its policymakers

when the official is the one who has the "final authority to establish municipal policy with respect to the action ordered." *Id*. at 481 (plurality opinion). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

In this case, the act of terminating the plaintiff occurred during the process of dissolving the so-called housing commission, which occurred as a result of official policy and under the supervision of defendant Michael Lutz, the chairman of the housing commission at the time. There is evidence that the dissolution of the housing commission took place after Lutz threatened the plaintiff not to become involved with commissioner Marzejon's protests and complaints, suggesting that the act occurred in retaliation for the exercise of Shimkus's First Amendment rights. The decision was made by a policymaker and carried into effect by an official action of the County. The plaintiff has established facts sufficient to withstand the County's motion for summary judgment on the section 1983 claim.

### 3. Qualified Immunity

All of the individual defendants argue that they are entitled to qualified immunity on Shimkus's section 1983 claim. Defendant Hinkner alleges the action to dissolve the Housing Commission was done in reliance on advice by corporation counsel, prior correspondence from HUD, Attorney General Opinions, and Michigan statutes, and he was unaware of Shimkus' involvement in contacting HUD. The other individual defendants contend that no reasonable government official would know that their actions were improper.

-46-

Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001): "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the officer's conduct violated a constitutional right,'" and then "the court must then decide 'whether the right was clearly established.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 201-02); *see also Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). "When the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ibid.* (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir.2000)).  The plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004).  Ordinarily, these questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

In this case, the right to be free from retaliation for speech protected by the First Amendment is clearly established.  But the qualified immunity defense requires the Court to look beyond the right in the abstract.  The Supreme Court has acknowledged that "[i]t is sometimes difficult for a [public official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts."  *Saucier*, 533 U.S. at 205.  Qualified immunity protects municipal personnel who must operate along the "hazy borders" that divide acceptable from unreasonable conduct.  *Id.* at 206.

A defendant government official may be protected by qualified immunity, even if the constitutional right he violated was clearly established, under certain "extraordinary circumstance" exceptions, such as reliance on legal advice.  *See V-1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1488 (10th Cir. 1990) (compiling cases); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (accounting for "exceptional circumstances" allowing qualified immunity defense where not otherwise entitled). The exception applies when the defendant demonstrates that the circumstances of the action taken in "reliance upon legal advice bars our imputation to [the defendant] of constructive knowledge concerning the laws allegedly violated by his conduct."  *V-1 Oil Co.*, 902 F.2d at 1489 (citations and quotations omitted).

In this case, the plaintiff's complaint about the service of the County Commissioners on the housing commission and their remuneration occurred at a time when his supervisors began to question his performance.  That fact alone does not absolve the individual defendants or make the constitutional right to free speech any less clearly established.  However, of the five individual defendants, the plaintiff has shown that only Lutz knew of his protected speech.  The other individual defendants cannot be found to have violated Shimkus's clearly-established constitutional

-48-

rights because their participation in the dissolution of the housing commission cannot be linked to Shimkus's protests.

However, there is evidence that defendant Lutz threatened the plaintiff with retaliation if he chose to speak out or otherwise supported Commissioner Marzejon's protests.  Lutz contends that he was acting in conformity with state law in dissolving the commission and transferring its functions to general county government and not rehiring the plaintiff.  However, "while it must be clear to the reasonable official that acts would violate the Constitution, it is irrelevant what the individual official actually believed about the legality of his or her action.  In addition, the specific action of the official need not have been found to have been unconstitutional in a prior decision to hold that official liable pursuant to § 1983, but the law must have established with particularity that the conduct complained of violated the Constitution before the official engaged in the unconstitutional act."  *Caudill v. Hollan*, 431 F.3d 900, 912 (6th Cir. 2005).  Since there is evidence that Lutz attempted to silence the plaintiff with threats of adverse job action, which eventually came to pass, the plaintiff has met his burden in the fact of Lutz's qualified immunity plea.

## V.  Conclusion

The Court finds that in 2003 when the critical events in this case occurred, Bay County did not have in place a housing commission established in accordance with State law.  Therefore, plaintiff Robert Shimkus must be considered to have been a Bay County employee at the time.  However, there is no legal requirement that the County operate its public housing project through a housing commission, and the plaintiffs' claims premised on that belief must fail.  Furthermore, none of the plaintiffs save Shimkus can maintain any of the claims in the second amended complaint against the defendants.  As for plaintiff Shimkus, he may proceed with his whistleblower claim

-49-

against Bay County and his First Amendment section 1983 claim against defendants Bay County and Lutz.  All of his other claims are dismissed.

Accordingly, it is **ORDERED** that the plaintiffs' motions for summary judgment [dkt #s 43, 51] are **DENIED**.

It is further **ORDERED** that the defendants' motions for summary judgment [dkt #s 46, 50, 52] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the defendants Hinkner, Poirier, Byrne, and Gwizdala are **DISMISSED** from this action.

It is further **ORDERED** that Counts II, III, V, VI and part of Count IV of the second amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that counsel for the remaining parties shall appear for a status conference on March 22, 2006 at 3 p.m. to establish calendar dates to resolve the remaining issues in the action.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 28, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 28, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS